**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Cindy Jenkin,

        Plaintiff,

v.

Commissioner of Social Security Administration,

        Defendant.

No. CV-17-00341-TUC-EJM

**ORDER**

Plaintiff Cindy Jenkin ("Jenkin") brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner"). Jenkin raises four issues on appeal: 1) the Administrative Law Judge ("ALJ") ignored substantial evidence of fibromyalgia; 2) the ALJ gave inappropriate weight to Dr. Kiarish's treating physician opinion; 3) the ALJ improperly discounted Jenkin's credibility based on her failure to seek treatment and continued smoking; and 4) the ALJ erred by finding that Jenkin's past work as a receptionist qualified as past relevant work ("PRW") and substantial gainful activity ("SGA"). (Doc. 15).

Before the Court are Jenkin's Opening Brief, Defendant's Response, and Jenkin's Reply. (Docs. 15, 17, & 18). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. For the reasons stated below, the Court finds that this matter should be reversed and remanded for further administrative proceedings.

## I. Procedural History

Jenkin filed an application for Social Security Disability Insurance and Supplemental Security Income on September 13, 2013.[1] (Administrative Record ("AR") 114). Jenkin alleged disability beginning on January 25, 2012 based on lumbar and cervical spine DDD, bilateral peripheral neuropathy, shoulder pain, headaches, and anxiety. *Id.* Jenkin's application was denied upon initial review (AR 128) and on reconsideration (AR 144). A hearing was held on November 4, 2015 (AR 72), after which ALJ Laura Speck Havens found, at Step Four, that Jenkin was not disabled because she could perform her PRW as a receptionist as generally performed. (AR 29). The ALJ also made an alternative finding at Step Five that Jenkin could perform other work existing in the national economy. (AR 30–31). On May 23, 2017 the Appeals Council denied Jenkin's request to review the ALJ's decision. (AR 1).

Jenkin's date last insured ("DLI") for DIB purposes December 31, 2013. (AR 114). Thus, in order to be eligible for benefits, Jenkin must prove that she was disabled during the time period of her alleged onset date ("AOD") of January 25, 2012 and her DLI of December 31, 2013.

## II. Factual History

Jenkin was born on August 23, 1966, making her 47 at the AOD of her disability. (AR 114). She has worked as a grocery cashier, bartender, cocktail waitress, and receptionist. (AR 228).

### A. Treating Physicians[2]

A letter dated August 19, 2011 from Scott Weary at First Chiropractic states that he treated Jenkin 8 times in 2006 for chronic neck pain and LBP and treatment was generally ineffective for pain relief. (AR 483). He treated Jenkin again in 2010 for neck

---

[1] Jenkin previously filed an application on January 28, 2010, alleging disability beginning on October 16, 2007. (AR 92). ALJ Norman R. Buls found that Jenkin had the RFC to perform the full range of sedentary work, that she could not perform her PRW, and that there were other jobs that she could perform; thus, he found Jenkin was not disabled. (AR 96, 100–101).
[2] While the undersigned has reviewed the entirety of the medical record in this matter, the following summary includes only the information most pertinent to Jenkin's appeal.

pain, LBP, and headaches, and she got some relief but overall treatment was not effective. Jenkin reported she had to continually use medication to try and sleep and function during the day, and Weary opined she was unable to work due to these problems. He completed a RFC assessment with the following limitations: sit and stand for 60 minutes at a time; need to sit in a recliner or lie down each day; sit, stand, and walk less than 2 hours each in a 8 hour workday; needed to change positions at will; take unscheduled breaks 4-5 times a day for 15 minutes each time; never carry more than 10 pounds and occasionally carry less than 10 pounds; significant limitation in repetitive reaching, handling, or fingering; and never stoop, crouch, kneel, or climb stairs. (AR 484–85). Weary opined that Jenkin functioned at 75% or less as compared to a healthy individual and would be absent from work more than 4 days per month. (AR 485–86).

On August 20, 2011 Dr. Kiarish opined that Jenkin could occasionally lift/carry 10 pounds, frequently lift/carry less than 10 pounds, stand and walk less than 2 hours, sit 6 hours, and would need to periodically alternate sitting, standing, and walking, with sitting/standing up to 30 minutes before changing positions and walking around every 5 minutes for 5 minutes at a time. (AR 319). He also opined that Jenkin would need to lie down 4 to 5 times per shift, could never twist, stoop, crouch, or climb ladders, could occasionally climb stairs, and that her reaching and pushing/pulling were affected by neuropathy. (AR 320). She would miss work more than 4 days per month due to her impairments. (AR 321). Dr. Kiarish noted that the limitations were supported by the MRI findings and Jenkin's decreased muscle strength and pain. (AR 320).

On March 28, 2012 Jenkin saw Dr. Moore and reported back, left buttock, and left hip pain, and said her hands go numb at random times. (AR 344). Findings on exam were upper back with significant increased muscle tone, slight discomfort to palpation at the base of the L SI/lower L buttock but normal ROM L hip. (AR 345). Dr. Moore discussed PT but Jenkin was hesitant due to cost and poor results in the past. (AR 346).

On April 4, 2012 Jenkin saw Dr. Norton and reported burning sensations in her low back, pain in her shoulders and left leg, and numbness and tingling in her hands. (AR

326). Jenkin said her symptoms started after cervical disc surgery in 2007, which alleviated the pain in her neck and right shoulder, but then she started having other symptoms. Her pain is constant and prevents her from doing most activities. On exam, Jenkin had good flexion/extension of the neck, tenderness to palpation of the back with some spasm, positive SLR on the right, good strength in arms and legs, diminished pinprick in a median nerve distribution bilaterally, and normal gait. Her MRI showed her previous surgery at C3-C4, no evidence of cord compression, and only slight foraminal narrowing at 3-4 on the right. (AR 326–27). Jenkin reported she had epidural blocks that did not provide relief. (AR 327). Dr. Norton could not define her symptoms as coming from a particular root segment, recommended EMGs, and noted she had clinical signs of carpal tunnel. (AR 327).

On May 31, 2012 Jenkin saw Dr. Song for evaluation of back pain. (AR 322). Dr. Song stated she was "somewhat suspicious" about the L5 radiculopathy shown in the EMG because of the normal MRI and Jenkin's diffuse symptoms. (AR 322–23). Findings on exam included no palpation tenderness over the spine, negative SLR, hip rotation does not reproduce pain, multiple-almost all of 18 tender points of fibromyalgia, and normal bulk and tone, gait, and reflexes. (AR 323). Dr. Song assessed fibromyalgia and noted that "the multiple tender points in her body exam, and the diffuse unexplainable pain may suggest fibromyalgia rather than radiculopathy." (AR 324). She recommended Gabapentin and a repeat EMG and NCS if no improvement.

On October 12, 2012 Jenkin went to the ER for constipation. (AR 339). She reported chronic back pain and said she was told she had fibromyalgia.

On October 18, 2012 Jenkin was seen for constipation. (AR 359). She denied painful joints, weakness, and headaches. (AR 360).

On March 12, 2013 Jenkin saw Dr. Moore for a medication follow-up and reported Lyrica and Cymbalta failed and she takes Gabapentin only at night because she can't function with it during the day. (AR 335). Jenkin reported pain in her low back with numbness and pain down the left leg into her foot and left elbow pain. She did not want

to see pain management because past injections didn't help and she can't afford the $900, can't afford PT, acupuncture didn't help, and she just wanted a diagnosis of what was wrong with her. (AR 335, 337). Dr. Moore encouraged mild exercise but Jenkin said she was unable to do anything. (AR 337). Findings on exam were full ROM left elbow with tenderness, tender to palpation over L SI joints and almost all along the paraspinous muscles thoracic and lumbar, painful and reduced LS ROM, and negative SLR. (AR 336). Dr. Moore assessed cervical disc disease, LS pain with radiculopathy, restless legs, abnormal weight gain, and L lateral epicondylitis. (AR 337).

On August 15, 2013 Jenkin was seen at the Laser Spine Institute for neck and shoulder pain and left arm numbness/tingling with pain 8/10, duration 15 years. (AR 388). Jenkin also reported buttock and low back pain, average 6–10/10, denied headaches, and reported a history of RLS and fibromyalgia. (AR 390–91). Findings on exam included left lumbar dermatomes hypo-esthetic at L4, L5, and S1; spinal flexion, hyperextension, and rotation painful and limited; and positive facet loading and shopping cart signs. (AR 392). Jenkin had a MRI of the lumbar spine and the impression was "degenerative changes are greatest where there is left paracentral disc bulge exerting mild mass effect upon the exiting left L4 nerve root at the left lateral recess at L3-4" and "the greatest neural foraminal stenosis is moderate on the left at L3-4." (AR 404). A MRI of the cervical spine found "degenerative changes are greatest where there is a moderate degree of neural foraminal stenosis on the left at C5-6." (AR 406). X-rays of the cervical spine showed mild retrolisthesis of C5 on C6 with extension, uncomplicated appearing anterior metallic fusion at C3-4, and mild C5-6 degenerative changes. (AR 408). X-rays of the lumbar spine found no abnormal vertebral body motion and mild degenerative changes, greatest at L3-4 and L5-S1. (AR 410). An x-ray of the pelvis showed normal alignment and osteopenia. (AR 411).

On August 16, 2013 Jenkin saw Dr. Gaitan and reported left side pain beginning above the beltline, radiating into the left glute and thigh. (AR 386). Pain aggravated with standing and walking and alleviated with sitting or walking while bent at the hips and

leaning on a shopping cart. Jenkin reported trying chiropractics and injections in the past with little relief. The impression was spinal stenosis at L3/4. Dr. Gaitan recommended surgery based on her symptoms and MRI/CT/x-ray findings showing degenerative disc disease, bulging disc, foraminal stenosis, and facet degen/hypertrophy at L3/4. (AR 384–85). He explained that she would first undergo a selective nerve root block, and if positive, a left L3/4 laminotomy/foraminotomy and decompression. (AR 386). Jenkin received the nerve root block that day and reported 80% improvement. (AR 399–401).

On August 19, 2013 Jenkin had surgery: a bilateral lumbar laminotomy and foraminotomy with decompression of the nerve roots, L3/4, and lumbar destruction by thermal ablation of the paravertebral facet joint nerves, right L3/4, bilateral L4/5, and bilateral L5/S1. (AR 363).

At an August 21, 2013 post-op assessment, Jenkin reported her radicular pain and numbness/tingling were totally resolved, and weakness and axial pain partially resolved. (AR 381). The doctor demonstrated stretching exercises and emphasized the importance of PT.

On September 3, 2013 Jenkin saw Dr. Moore and reported good results from her lumbar disc herniation surgery with no more pain in her left leg. (AR 331). The assessment was lumbar disc herniation and lumbar disc disease responding to treatment. (AR 332).

On November 8, 2013 Jenkin called the Laser Spine Institute and reported no improvement from her surgery. (AR 431). Prior to surgery she had primarily left LBP relieved with lying on her left side; now she has bilateral LBP radiating to the left buttocks and thigh, and can't get comfortable in any position.

On November 22, 2013 Jenkin saw Dr. Morales and reported low back pain, buttock pain, difficulty walking, and numbness/tingling, with pain 6–8 when resting and 9–10 when active. (AR 373). Her pain was constant and she had it for 5 years, pain increased with standing and walking, and pain reduced with sitting. Findings on exam include spinal tenderness at L3/4, L4/5, L5/S1, and SIJ; spinal flexion, hyperextension,

and rotation painful and limited; and positive SLR, Hoffman's test, and Patrick's test on the left. (AR 375). X-rays of the lumbar spine showed stable retrolisthesis of L4 on L5 with no evidence of abnormal vertebral body motion, and degenerative changes greatest at L3-4 and L5-S1. (AR 418). X-rays of the pelvis showed no discrete abnormality, osteopenia, lumbar spine degenerative changes, and mild bilateral hip joint osteoarthritic changes. (AR 419). A MRI of the lumbar spine showed: "Interval postoperative changes of bilateral L3 laminectomies with decreased mild canal stenosis at this level. Stable left paracentral disc bulge results in mild mass effect upon the exiting left L4 nerve root the left lateral recess. [and] Stable neuroforaminal stenoses, greatest where there is moderate left-sided neural foraminal stenosis at L3-4." (AR 424).

On November 25, 2013 Jenkin had a cervical MRI consult and reported neck pain, shoulder pain, headache, and wearing a neck brace to sleep due to neck pain. (AR 366). Her average daily pain was 7–10/10 and she had it for 8 years; pain worse with any activity; pain reduced with ice and neck/back support. (AR 367). The assessment was spinal stenosis in cervical region, displacement of cervical intervertebral disc without myelopathy, cervical spondylosis without myelopathy, and degeneration of cervical intervertebral disc. (AR 367). On the same date Jenkin also had a lumbar MRI discussion and reported the most intense sharp pain she had prior to surgery was gone, but the rest of her pain remained; she had about 10% relief. (AR 369). She reported lower back pain radiating to the gluteal area and pressure and numbness in the left foot. (AR 371). Her pain is aggravated with everything and sometimes alleviated with changing positions or lying flat on her stomach. (AR 371). On exam strength and sensation in the lower extremities were normal, positive SLR on the left, and lower back pain with facet loading. The doctor reviewed Jenkin's MRI and x-ray results, noted she continued to have similar symptoms that were present preoperatively, and recommended an epidural steroid injection to help with postoperative inflammation and swelling. (AR 372). Jenkin received the injection that day and reported 20% improvement. (AR 395–97).

On December 11, 2013 Jenkin called Laser Spine Institute and reported no relief

from the injection, even initially. (AR 436). The doctor recommended another injection and Jenkin said she would call back to schedule. (AR 437–38).

On December 29, 2014 Jenkin saw Dr. Gallo and reported that her back was getting worse and that she cried almost every night because of pain. (AR 458). She had not gone to pain management since the Laser Spine Institute because she couldn't afford it. Medication does help her RLS. Dr. Gallo ordered MRIs due to Jenkin's worsening neck and LBP. (AR 460).

On February 12, 2015 Jenkin saw Dr. Gallo and reported stomach pain and dizzy spells; she went online and thought she had pancreatic cancer. (AR 461). Dr. Gallo noted he referred her to a GI doctor the previous July and she did not go, but now she was willing. He also noted that she "went on and on about concerns" and "doesn't want to do things I tell her to do" and that Jenkin "says she can't afford to do a lot of things anyway." (AR 463).

On March 26, 2015 Jenkin saw Dr. Gallo and reported her RLS medication worked for her but she still always had neck and back pain. (AR 464). She takes Gabapentin for the burning sensation in her legs and buttocks and it helps significantly. She also reported bad headaches behind her right eye, she thinks related to her neck pain. Dr. Gallo noted that a MRI of the lumbar spine on January 2, 2015 showed unchanged left foraminal protrusion at L3/4 and bilateral laminectomy L3/4 with decreased scar tissue. (AR 465). He opined that the headaches were separate from Jenkin's neck pain and could be migraines, but she did not want to try medication or see a neurologist. (AR 467). He referred her to Dr. Hanks for chronic cervicalgia, LBP, cervical disc protrusion, and nerve root impingement L3-L4.

On September 23, 2015 Jenkin saw Dr. Gallo and reported she left Dr. Hanks' office crying. (AR 468). Dr. Hanks said the surgery she needs would be difficult and lengthy. Jenkin went to the appointment with Dr. Hanks but did not realize the injection was supposed to be for a diagnostic test so she didn't get it; claimed he told her he does not treat lower backs and she doesn't want to go back to him. She did not go to PT or do

the PT that Dr. Hanks said she should do and she didn't receive a referral. Dr. Gallo referred her to PT.

On October 19, 2015 Jenkin had an initial evaluation at Ideal Physical Therapy. (AR 477). Jenkin reported neck pain worsens with computer work, reading, and activity in general, and LBP worsens with prolonged sitting, standing, walking, bending, and some lifting, and she takes medication to sleep through the night. Jenkin rated her L-spine pain 8/10 current, 7/10 best, and 9/10 worst, and C-spine pain 5/10 current, 4/10 best, and 8/10 worst. The therapist noted she was regularly shifting during the evaluation due to discomfort and recommended PT twice a week for 12 weeks. (AR 479). On October 21, 2015 Jenkin reported neck pain 6/10 and LBP 9/10, and slight reduction in symptoms with treatment. (AR 476). On October 23, 2015 Jenkin reported she felt better until she showered and did her hair and now pain was 6/10. (AR 475). On October 26, 2015 Jenkin reported pain in low back was coming and going, 6/10, and no increase in symptoms during treatment. (AR 474). On October 28, 2015 Jenkin reported increased pain, 7/10, with pain in her back and left hip. (AR 473). On November 2, 2015 Jenkin reported a slight decrease in symptoms with treatment. (AR 472).

B.    State Agency Consulting Physicians

On January 2, 2014 Jenkin saw Dr. Rohen for a psychological evaluation. (AR 442). Jenkin reported she was seeking disability benefits because of back problems and that her depression and anxiety started in 2005 when she had neck pain and her doctors and employers thought she was exaggerating her symptoms. Jenkin spends her days looking at coupons on the computer until the pain is too much; she does most of the cleaning but struggles with vacuuming and mopping and her husband helps on the weekends; they share grocery shopping and she does some cooking. (AR 443). Dr. Rohen found that Jenkin was a reliable and consistent historian, and diagnosed adjustment disorder with mixed anxiety and depressed mood in response to chronic stressors. (AR 444). She opined that these conditions were not severe enough to impact Jenkin's work performance or attendance.

C.    State Agency Reviewing Physicians

On January 14, 2014 DDS physician Dr. Goodrich made an initial determination that Jenkin was not disabled. (AR 126). Dr. Goodrich found Jenkin was partially credible due to some evidence in the record stating an impression of exaggerating symptoms. He completed a RFC assessment with the following limitations: occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and walk for 2 hours, sit for 6 hours, unlimited pushing and pulling, occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl, never climb ladders, and avoid concentrated exposure to hazards. (AR 121–23).

On reconsideration, Jenkin was again found not disabled on May 8, 2014. (AR 128). DDS physician Dr. Fina found that she was partially credible because the degree of symptoms was somewhat disproportionate to the expected severity based on the evidence. (AR 138). Dr. Fina found that Jenkin could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and walk for 4 hours, sit for 6 hours, unlimited pushing and pulling, occasionally climb ramps/stairs, kneel, crouch, and crawl, never climb ladders, frequently balance and stoop, and avoid concentrated exposure to hazards. (AR 139–40).

D.    Plaintiff's Testimony

On a Function Report dated December 2, 2013 Jenkin stated that constant pain limited her ability to work. (AR 244). She does light house work and checks her email, takes care of her dog, prepares easy meals, and can take care of her personal needs with difficulty and requires extra time. (AR 245–46). She goes out once a week and can drive and grocery shop, but has pain from sitting or walking for long periods. (AR 247). Jenkin reported that her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs. (AR 249). She can walk for 20 minutes and then needs to rest for 15–30 minutes.

On a Disability Report—Appeal dated May 28, 2014 Jenkin reported that even after her back surgeries, she had to be careful how she moved and for how long, resting every 15–20 minutes, and that her RLS kicked in after sitting for 15–20 minutes. (AR

275). At church, she has to be allowed to sit and stand or adjust in her seat, or leave to walk to the bathroom. (AR 279).

At the hearing before the ALJ, Jenkin testified that she was unable to work because after her neck surgery, the symptoms started spreading down her back and her pain got worse. (AR 75, 82). She has pain in her neck, shoulders, lower back, and all the way down her left leg. (AR 80). The pain is burning, throbbing, and sometimes stabbing, she has it all the time, and her average pain is a 9/10. (AR 80–81, 83). She does not take any pain medication, only medication to help her sleep. (AR 80). She can sleep for 7 hours a night with medication; she takes Gabapentin and Ropinirole for her RLS. (AR 78–79). She goes to the doctor on average once or twice a year. (AR 80).

She can usually dress and bathe herself without help, tries to help with chores, cooks sometimes, does the dishes while leaning against the sink, mops or sweeps "once in a blue moon" and in 10 minute increments, does laundry, grocery shops, and waters her plants. (AR 76–77). She watches TV 4–5 hours a day and does not exercise. (AR 78). She usually goes to church on Sundays but will watch it online if she's having a bad day. (AR 78).

Jenkin testified that she can walk for 20 minutes but it's painful and she has to lean on the grocery cart; sit for 10 minutes; lift a gallon of milk; and drive for 15 minutes before she's absolutely miserable. (AR 78, 80). It hurts to sit and stand; she tries to lie down during the day for a couple of hours. (AR 83–84).

On questioning by her attorney as to what further treatment had been recommended for her nerve root impingement, Jenkin testified that she was referred to see surgeons but two said they would not see her due to her prior surgery and a third said he didn't see anything. (AR 83). She was also referred PT. There were no recommendations for treatment of her carpal tunnel.

E.    Lay Testimony

Jenkin's husband completed a Function Report—Third Party on December 4, 2013. (AR 257). He reported that Jenkin spends her days doing light house work, taking

care of the dog, paying bills, and they prepare dinner together. After dinner Jenkin lays on the couch with ice packs and pain medicine trying to get comfortable but it's impossible until she lays flat in bed. Mr. Jenkin stated that Jenkin cannot stand or sit longer than 1 hour due to back pain and pain makes it difficult for her to sleep. (AR 258). He helps her with bathing and dressing when she cannot bend over or twist. She goes out once or twice a week, can drive, and grocery shops for an hour. (AR 260). Jenkin watches TV and reads and enjoys baking but can no longer do it; she cannot sit or stand for over 30–40 minutes. (AR 261). Mr. Jenkin reported that Jenkin's illness affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks because her range of motion is drastically affected and she can only do things slowly or in small increments. (AR 262). She can walk for ¼ mile and then needs to rest for 15 minutes. Mr. Jenkin reported that his wife endures severe back pain daily from the time she wakes until she goes to bed, most nights she goes to bed early to minimize the pain by lying flat, and she cannot work because she cannot stand or sit for extended periods of time and constantly needs to take breaks or rest. (AR 264).

     F.    <u>Vocational Testimony</u>

At the hearing before the ALJ, Shirley Ripp testified as a vocational expert. She stated that Jenkin's past work as a grocery checker, bartender, and bar waitress was classified as light, and her work as a receptionist was sedentary. (AR 84–85).

The ALJ asked Ripp to assume an individual with Jenkin's education and work experience with the following limitations: sit 6 hours out of an 8-hour day; stand and walk 4 hours; occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders; and occasional exposure to heights and moving machinery. (AR 85). Ripp testified that such a person could do Jenkin's past work as a receptionist. She could also perform other work such as call-out operator, document preparer, and addressing clerk. (AR 85–86).

Jenkin's attorney asked Ripp to assume an individual with the following

limitations: stand or walk less than 2 hours; sit for 6 hours but would need to alternate from sitting to standing every 30 minutes; would need to take breaks every 5 minutes to walk around for 5 minutes; would need to lie down at unpredictable times 4-5 times a day; never twist, stoop, bend, crouch, or climb ladders; and limited ability for reaching, pushing, and pulling. (AR 86–87). Ripp testified that there was no work available for such a person. (AR 87).

### G. ALJ's Findings

The ALJ found that Jenkin had the severe impairments of degenerative disc disease, peripheral neuropathy, and headaches. (AR 23). The ALJ found Jenkin's restless leg syndrome and constipation were not severe because there were no significant objective medical findings in the record for these impairments to be considered severe, and Jenkin's RLS was medically managed. *Id.* The ALJ also found that Jenkin's depression and anxiety were not severe because they caused no more than minimal limitations on her ability to work. (AR 24).[3]

The ALJ found that Jenkin's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible for the reasons explained in the decision. (AR 26). The ALJ summarized the medical findings and noted the following: Jenkin had a significant gap in treatment for her back pain between December 2013–December 2014, with conservative check-ups through September 2015; Jenkin failed to even mention her headaches on numerous occasions and "the lack of even conservative treatment during the period under consideration [was] highly unusual"; Jenkin's "noncompliance [with the medical regimen specified by her physicians] does not support the alleged intensity and duration of pain and subjective complaints"; and Jenkin's failure to follow recommendations to quit smoking "suggest that her back

---

[3] The ALJ also considered the Paragraph B criteria set out in the social security disability regulations for evaluating mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00. To satisfy the paragraph B criteria, the mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. *Id.* The ALJ found Jenkin had no limitation in activities of daily living, mild limitation in social functioning and concentration, persistence, or pace, and no episodes of decompensation of extended duration. (AR 24).

symptoms may not have been as limiting as the claimant has alleged, given the prevalence that cigarette consumption exacerbates back pain." (AR 27–28).

The ALJ stated that she could not give significant weight to Mr. Jenkin's opinion because it was "simply not consistent with the preponderance of the opinions and observations by medical doctors." (AR 28). The ALJ also noted that he was not medically trained thus the accuracy of the information was questionable, and that he could not be considered a disinterested third party.

The ALJ gave little weight to Dr. Kiarish's opinion because it was too restrictive based on other evidence in the record, and because the opinion relied heavily on Jenkin's subjective complaints. (AR 28–29). The ALJ further noted that the opinion was made outside the relevant period and did not state the duration or permanency of the limitations. (AR 29).

The ALJ gave no weight to the opinion of chiropractor Scott Weary because he was not an acceptable medical source and therefore not able to diagnose a medically determinable impairment. (AR 29). The ALJ also noted that the limitations he assessed exceeded those recommended by Dr. Kiarish, and that his opinion was rendered outside the relevant time period.

The ALJ gave great weight to Dr. Rohen's opinion and the state agency consultant opinions because they were "well-versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act" and because their opinions were consistent with the record and Jenkin's activities of daily living. (AR 29).

The ALJ found that Jenkin had the RFC to perform sedentary work with the following limitations: stand/walk 4 hours in a 8-hour workday; never climb ladders; occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; and occasional exposure to heights and moving machinery. (AR 25).

The ALJ found that Jenkin could perform her PRW as a receptionist as actually and generally performed. (AR 29). The ALJ also found that Jenkin could perform other jobs existing in the national economy such as call-out operator, document preparer, and

addressing clerk. (AR 30–31). The ALJ therefore concluded Jenkin was not disabled. (AR 31).

### III.    Standard of Review

The Commissioner employs a five-step sequential process to evaluate SSI and DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) the claimant's RFC precludes him from performing his past work. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4).

Here, Jenkin was denied at Step Four of the evaluation process. Step Four requires a determination of whether the claimant has sufficient RFC to perform past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as that which an individual can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. A RFC finding is based on the record as a whole, including all physical and mental limitations, whether severe or not, and all symptoms. Social Security Ruling (SSR) 96-8p. If the ALJ concludes the claimant has the RFC to perform past work, the claim is denied. 20 C.F.R. §§ 404.1520(f), 416.920(f).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by

substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Valentine*, 574 F.3d at 690 (internal quotation marks and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (internal citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotations and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (internal citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (citing *Shinseki v. Sanders*, 556 U.S. 396 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id.* (internal quotations and citations omitted).

Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." *Strauss v. Comm'r Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

## IV. Analysis

Jenkin argues that the ALJ failed to mention the fact that she has been diagnosed with fibromyalgia, that the ALJ improperly gave Dr. Kiarish's opinion little weight, and that the ALJ improperly discounted her credibility based on her failure to seek treatment and continued smoking. Jenkin further argues that the ALJ erred in finding that her past work as a receptionist qualified as SGA and PRW because the work was only part-time. Jenkin requests that the Court remand this matter for an award of benefits or further administrative proceedings.

The Commissioner argues that the ALJ reasonably omitted Jenkin's fibromyalgia at Step Two, and that if the ALJ did err, the error was harmless. The Commissioner further argues that substantial evidence supports the ALJ's finding that Dr. Kiarish's opinion was entitled to little weight and that Jenkin was less than credible. Finally, the Commissioner argues that even if the ALJ did err in finding that Jenkin's past work as a receptionist qualified as SGA, the error is inconsequential because Jenkin fails to challenge the ALJ's alternate finding at Step Five that she could adjust to other work.

The Court finds that the ALJ erred in negatively assessing Jenkin's credibility based on her failure to seek treatment. This error impacted the ALJ's weighing of the medical opinions, the RFC assessment, and the hypotheticals posed to the VE. Consequently, the error was not harmless because it ultimately impacted the ALJ's nondisability finding. Because factual issues remain regarding whether Jenkin is disabled under the regulations, and because Jenkin's credibility is best reassessed in light of the record as a whole, the Court declines to address the other issues raised by Jenkin in her appeal and will remand this matter for further administrative proceedings.[4]

---

[4] The Court further declines to determine whether the ALJ erred in finding that Jenkin's past work as a receptionist qualified as SGA. If a claimant has earned less than a certain minimum amount then the ALJ will generally conclude that the claimant has not engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1574(b)(3), 416.974(b)(3). If the

Jenkin argues that the ALJ erred in negatively assessing her credibility because of her failure to seek treatment and her continued smoking. Jenkin further states that had the ALJ followed SSR 82-59 and inquired why she did not pursue recommended treatment, the ALJ would have found her more credible and would have assigned more weight to Dr. Kiarish's opinion. Jenkin also notes that the Ninth Circuit has expressed doubt as to whether a claimant's continued smoking is a proper reason to discount their credibility, and further that there is nothing in the record stating that her doctors recommended she quit smoking specifically to improve her back pain.

"An ALJ's assessment of symptom severity and claimant credibility is entitled to great weight." *Honaker v. Colvin*, 2015 WL 262972, *3 (C.D. Cal. Jan. 21, 2015) (internal quotations and citations omitted). This is because "an ALJ cannot be required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Treicherler v. Comm'r. Soc. Sec. Admin.*, 775 F.3d 1090, 1106 (9th Cir. 2014). "If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court may not engage in second-guessing." *Honaker*, 2015 WL 262972 at * 3 (internal quotations and citation omitted).

While questions of credibility are functions solely for the ALJ, this Court "cannot

claimant has earned more than the minimum amount then the ALJ will generally conclude that that claimant has engaged in SGA. *See* 20 C.F.R. §§ 404.1574(b)(2), 416.974(b)(2). However, work may be considered substantial even if it is done on a part-time basis. 20 C.F.R. §§ 404.1572(a), 416.972(a).

Here, Jenkin argues that her work as a receptionist cannot qualify as PRW or SGA because it was only part-time. Jenkin points to her detailed earnings query, which shows that when she worked as a receptionist for Realty Executives of Tucson, she earned $7,511.68 in 2002 and $2,529.75 in 2003. (AR 217). Defendant points to Jenkin's self-reported work history, which listed the receptionist job as 6 hours per day, 5 days per week, at $8.50/hour. (AR 228). While Jenkin's self-reported work history would support a finding that the receptionist job qualified as SGA, the detailed earnings query would weigh against such a finding. *See* https://www.ssa.gov/OACT/COLA/sga.html (listing monthly SGA amounts). However, because even part-time work may be considered SGA, and the amount of hours worked is only one factor that the ALJ considers, the Court declines to resolve this issue here and the parties may raise it before the ALJ on remand as needed. *See Keyes v. Sullivan*, 894 F.2d 1053, 1056 (9th Cir. 1990). The Court further notes that even if the receptionist job was not SGA, the ALJ found Jenkin could perform other work.

affirm such a determination unless it is supported by specific findings and reasoning." *Robbins v. Comm'r Soc. Sec. Admin.* 466 F.3d 880, 885 (9th Cir. 2006). "To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id*. at 1036 (quoting *Bunnell v. Sullivan*, 947 F. 2d 341, 344 (9th Cir. 1991)). "Second, if the claimant meets this first test and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of the symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotations and citations omitted).

The ALJ did not make a finding that Jenkin was malingering; therefore, to support her discounting of Jenkin's assertions regarding the severity of her symptoms, the ALJ had to provide clear and convincing, specific reasons.[5] Jenkin specifically challenges the ALJ's finding that she was not entirely credible based on her failure to seek treatment. In her written decision, the ALJ noted that Jenkin had a significant gap in treatment for her back pain between December 2013–December 2014 with conservative check-ups through September 2015, that Jenkin failed to even mention her headaches on numerous occasions and "the lack of even conservative treatment during the period under consideration [was] highly unusual," and that Jenkin's "noncompliance [with the medical regimen specified by her physicians] does not support the alleged intensity and duration

---

[5] As an initial matter, the Court notes that Defendant concedes that Jenkin's continued smoking is not a valid reason for the ALJ to discount her credibility. *See* Doc. 17 at 10 n.1. Further, the Court finds no evidence in the record that Jenkin's doctors specifically recommended that she quit smoking in order to alleviate her pain or other symptoms.

of pain and subjective complaints." (AR 27–28).

"[I]f a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated." *Orn*, 495 F.3d at 638; *Everson v. Astrue*, 2012 WL 5994972, *7 (W.D. Wash. Oct. 22, 2012) ("Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a finding that a proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony." (internal quotations and citation omitted)). However, "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Orn*, 495 F.3d at 638 (quoting *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)). While Social Security regulations require claimants to follow "treatment prescribed by your medical source(s)" to receive benefits, the same regulations make clear that if the claimant has a "good reason" and "justifiable cause" for not following the prescribed treatment, rejection of treatment will not be held against the claimant. 20 C.F.R. § 416.930; SSR 82-59; SSR 96-7p.[6] The ALJ "'must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment' including inability to pay . . ." *Orn*, 495 F.3d at 638 (quoting SSR 96-7p at 7–8).

While the Court acknowledges that there is limited information in the record documenting whether and during what time period(s) Jenkin had insurance coverage, there are notes in the medical records indicating that Jenkin could not afford to pay out of pocket for injections, PT, or pain management appointments. (AR 335, 337, 346, 458, 463). When Jenkin's claim was denied on reconsideration, the SSA forms noted that: "Claimant and her husband made substantial personal and financial sacrifices to be able for her to have the first laminectomy and had very high hopes she would be back on her

---

[6] SSR 96-7p was still in effect at the time of the ALJ's decision in this matter but has now been superseded by SSR 16-3p, effective March 28, 2016.

feet—only to have their hopes dashed because her symptoms have returned to about the same levels—except with more radiating pain down her legs." (AR 130, 265). Further, a Disability Report dated May 28, 2014 notes that Jenkin's surgeons proposed further surgery, but it would be at an out-of-pocket cost of $11,500 to Jenkin. (AR 277). And, though the record does reflect a gap in treatment from December 11, 2013 to December 29, 2014, when Jenkin did attend medical appointments prior to and after this time period, she consistently reported back pain and pain radiating into her shoulders and left hip, buttock, leg, and foot.

Further, "[i]n Social Security cases, the ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001). "The ALJ is not a mere umpire at such a proceeding . . . it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003). An ALJ's duty to develop the record further is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). Moreover, "[a] specific finding of ambiguity or inadequacy of the record is not necessary to trigger this duty to inquire, where the record establishes ambiguity or inadequacy." *McLeod v. Astrue*, 640 F.3d 881, 886 (9th Cir. 2010).

While it is the claimant's burden to prove that she is disabled, *Valentine*, 574 F.3d at 689, the ALJ's duty to further develop the record arises in cases such as this one, where the record is inadequate to allow for proper evaluation of Jenkin's alleged failure to seek treatment. *See e.g. Garcia v. Comm'r Soc. Sec. Admin.*, 768 F.3d 925, 932 (9th Cir. 2014) ("We have consistently treated an ALJ's failure to adequately develop the record as reversible legal error."). The ALJ cited Jenkin's limited treatment and failure to follow treatment recommendations as a reason to discount her credibility, yet during the hearing the ALJ never inquired why Jenkin did not see her doctors more often or pursue

other treatments. Because the record here is inadequate, additional development of this issue is required. *See* SSR 82-59 ("The record must reflect as clearly and accurately as possible the claimant's . . . reason(s) for failing to follow the prescribed treatment.").

Thus, the Court finds "[Jenkin's] failure to receive medical treatment during the period that [s]he had no medical insurance cannot support an adverse credibility finding[,]" and it was legal error for the ALJ not to further develop the record to develop a more complete understanding of Jenkin's reasons for not pursuing additional treatment. *Orn*, 495 F.3d at 638. Further, this error was not harmless. Had the ALJ properly considered Jenkin's lack of medical insurance as a reason for her "conservative treatment" and "noncompliance," the ALJ could not have relied on this lack of treatment to justify her adverse credibility finding. The adverse credibility finding in turn affected the ALJ's assessment of the medical opinions, the RFC assessment, and the hypotheticals posed to the VE. Thus, this error was harmful because it affected the ultimate nondisability determination. *See Molina*, 674 F.3d at 1115; *Garcia*, 768 F.3d at 929 ("While it is not certain from the record before us that [Plaintiff] would have been determined to be disabled if the record had been properly developed, it is also not clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." (internal citation omitted)). Accordingly, the Court finds remand is warranted to fully develop the record to adequately assess Jenkin's conditions and limitations and to determine whether she was unable to seek treatment during the relevant period due to lack of insurance.

## V. Remedy

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690.

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989) (quoting *Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). Conversely, remand for an award of benefits is appropriate where:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting *Garrison*, 759 F.3d at 1021).

"[T]he required analysis centers on what the record evidence shows about the existence or non-existence of a disability." *Strauss v. Comm'r Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011). "Administrative proceedings are generally useful where the record has not been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further evidence may well prove enlightening in light of the passage of time." *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014) (internal quotations and citations omitted). "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate." *Id.* "In evaluating [whether further administrative proceedings would be useful, the Court considers] whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules." *Id.* at 1103–04. "This requirement will not be satisfied if 'the record raises crucial questions as to the extent of [a claimant's] impairment given inconsistencies between his testimony and the medical evidence in the record,' because '[t]hese are exactly the sort of issues that should

be remanded to the agency for further proceedings.'" *Brow-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) (quoting *Treichler*, 775 F.3d at 1105).

Here, the Court finds "[r]emand for further administrative proceedings is appropriate [because] enhancement of the record would be useful." *Benecke*, 379 F.3d at 593. The ALJ erred in negatively assessing Jenkin's credibility by giving improper consideration to her lack of treatment and failing to develop the record and obtain an accurate understanding of why Jenkin did not pursue further treatment. However, "'a reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony.' The touchstone for an award of benefits is the existence of a disability, not the agency's legal error." *Brown-Hunter*, 806 F.3d at 495 (quoting *Treichler*, 775 F.3d at 1106). Thus, remand for an award of benefits would be inappropriate because the record raises crucial questions about the extent to which Jenkin's alleged pain and other symptoms render her disabled, given the gap in treatment and conservative treatment history (for example, Jenkin alleges constant pain, 9/10, yet only takes medications at night to help her sleep, and applied for disability in part based on headaches, yet these are barely mentioned in the medical record and she apparently takes no medication for them). *See Brown-Hunter*, 806 F.3d at 496. Jenkin's credibility is best reassessed in consideration of the entire record, and on remand the ALJ shall give further consideration to all of the previously submitted medical testimony and lay testimony and continue the sequential evaluation process to determine whether Jenkin is in fact disabled. "Viewing the record as a whole [this Court] conclude[s] that Claimant may be disabled. But, because the record also contains cause for serious doubt, [the Court] remand[s] . . . to the ALJ for further proceedings on an open record." *Burrell*, 775 F.3d at 1142. The Court expresses no view as to the appropriate result on remand.

## VI.    Conclusion

In light of the foregoing, **IT IS HEREBY ORDERED** that the Commissioner's decision is remanded back to an ALJ on an open record with instructions to issue a new

decision regarding Jenkin's eligibility for disability insurance benefits.

The Clerk of Court shall enter judgment accordingly and close its file on this matter.

Dated this 6th day of September, 2018.

Eric J. Markovich
United States Magistrate Judge